1  **BRYAN CAVE LLP**
James Goldberg, California Bar No. 107990
2  Tracy M. Talbot, California Bar No. 259786
Two Embarcadero Center, Suite 1410
3  San Francisco, California 94111
Telephone:     415-675-3400
4  Facsimile:      415-675-3434
Email:            james.goldberg@bryancave.com
5                     tracy.talbot@bryancave.com

6  Attorneys for Plaintiffs
HUNTAIR, INC. and CLPK, LLC
7

FILED 99

AUG - 6 2010

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

8

9                 UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11                 SAN FRANCISCO DIVISION

CV 10  3450

12  HUNTAIR, INC., a Delaware corporation,
and CLPK, LLC, a Delaware limited liability
13  company,

14                 Plaintiffs,

15         vs.

16  SETH GLADSTONE, an individual;
STEVE MOSER, an individual; LORNA
17  GLADSTONE, an individual; DAVID
LANGER, an individual; L4 STRATEGIES,
18  INC., a California corporation d/b/a
RELIANT COMPONENTS AND
19  SERVICES; and DOES 1 through 20,
inclusive,
20

21                 Defendants.

22

23

24

25

26

27

28

**COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF**

1.   BREACH OF THE DUTY OF
      LOYALTY;
2.   FRAUD;
3.   INTENTIONAL INTERFERENCE
      WITH PROSPECTIVE ECONOMIC
      ADVANTAGE;
4.   RACKETEERING - 18 U.S.C. § 1962(c)
      (RICO);
5.   RACKETEERING CONSPIRACY – 18
      U.S.C. § 1962(d) (RICO);
6.   SECTION 43(a) OF THE LANHAM
      ACT, 15. U.S.C. § 1125(a);
7.   UNLAWFUL AND UNFAIR
      BUSINESS PRACTICES (BUS. & PROF.
      CODE § § 17200 *ET SEQ*); and
8.   CONVERSION

**DEMAND FOR JURY TRIAL**
[N.D. Cal. Rule 3-6(a)]

SL01DOCS3452236.8

COMPLAINT FOR DAMAGES

1    Come now Plaintiffs Huntair, Inc. ("Huntair") and CLPK, LLC ("CLPK")

2  (collectively, "Plaintiffs") and for their causes of action allege as follows:

3                              **INTRODUCTION**

4        1.      This action involves claims against two of Plaintiffs' former employees,

5  defendants Seth Gladstone ("Gladstone") and Steve Moser ("Moser"), who orchestrated

6  elaborate schemes with others to obtain kickbacks and to divert business improperly away

7  from Plaintiffs (including, specifically, Huntair and CLPK's Servicor and Cleanpak businesses)

8  for their own financial gain.  The participants in the schemes included, in addition to

9  Gladstone and Moser: Gladstone's friend, David Langer ("Langer"); Langer's company, L4

10  Strategies, Inc. ("L4 Strategies"), doing business as Reliant Components and Services

11  ("Reliant"); Gladstone's wife, Lorna Gladstone; and Gladstone's former friend, Vince Tringali

12  ("Tringali").  The schemes were also implemented through businesses that were operated

13  under fictitious names, including specifically a business controlled and operated by Gladstone

14  and his wife, G-5 Group; Reliant, which is a business created and controlled by Langer, L4

15  Strategies, Gladstone and Moser; a Gladstone business known as Custom Tinting Unlimited

16  ("Custom Tinting"); and Tringali's business, called Tringali Construction.

17        2.      The victims in the schemes were Cleanpak International, Inc. ("Cleanpak

18  International"), which is now CLPK, and Huntair.  Both Huntair and Cleanpak International

19  were subsidiaries of CES Group, Inc. ("CES"); and Huntair and CLPK are subsidiaries of

20  CES today.

21        3.      Both Cleanpak International and Huntair were engaged in the business of

22  manufacturing and selling various products used for air flow management and cleanroom

23  technology.  Gladstone and Moser were employed by Cleanpak International from at least

24  January 1, 2007 (on information and belief, the pertinent date for purposes of the earlier of

25  the claims herein) through on or about October 18, 2009.  Cleanpak International did

26  business as both Cleanpak and Servicor during this time.  As of October 18, 2009, Gladstone

27  and Moser became employees of Huntair, where they remained until they were terminated in

28  mid-July 2010.

COMPLAINT FOR DAMAGES

1  4.  As alleged in more detail below, there are at least several aspects to the various
2  schemes:

3  (a)  As set forth in the Declaration of Vince Tringali attached hereto as
4  Exhibit A and incorporated herein (the "Tringali Declaration"), Gladstone was involved in a
5  kickback scheme with Tringali and Tringali Construction from approximately January 2007
6  through approximately September 2009 (the "Tringali scheme"). Under the Tringali scheme,
7  Tringali essentially would quote a Servicor (i.e., Cleanpak International) job for Gladstone;
8  Gladstone would then inflate Tringali's quote in what Gladstone provided to Servicor;
9  Servicor (i.e., Cleanpak International) would then pay Tringali for the work; and Tringali
10  would then kick back the inflated portion to Gladstone through checks made payable to (i)
11  Gladstone, (ii) Gladstone's wife Lorna, (iii) her business, "G-5 Group," or (iv) his business,
12  Custom Tinting (collectively, the "Gladstones"). Tringali, on information and belief, paid the
13  Gladstones approximately $163,000 in kickbacks pursuant to the Tringali scheme;

14  (b)  Gladstone, Moser, Langer, and L4 Strategies were engaged in a scheme
15  in 2010 pursuant to which they improperly diverted, attempted to divert and/or are
16  attempting to divert business and potential business from Huntair to Reliant (the "Reliant
17  scheme"). Under the Reliant scheme, Gladstone and Moser steered business and potential
18  business to Reliant, and helped Reliant pursue and/or obtain the business, even though
19  Gladstone and Moser were employed by Huntair at the time. Gladstone, Moser, Langer and
20  L4 Strategies were working together in competition against Huntair – while Gladstone and
21  Moser were Huntair employees – with Gladstone and Moser to be paid commissions and/or a
22  percentage of the profits in connection with Reliant's sales. In addition, during their Huntair
23  employment, Gladstone and Moser, along with Langer and L4 Strategies, recruited and
24  encouraged other Huntair employees to participate in the Reliant scheme;

25  (c)  Gladstone, Moser, Langer and L4 Strategies engaged in a variety of
26  deceptive, misleading, fraudulent and/or otherwise improper activities in connection with
27  their misconduct, including but not limited to: (1) Gladstone submitting invoices to Cleanpak
28  International, in connection with the Tringali scheme, that appeared to have been prepared by

1  Tringali Construction but which actually had been prepared by Gladstone and which

2  contained Gladstone's inflated pricing; (2) Gladstone directing Tringali to make up excuses to

3  avoid discussing project pricing with anyone from Cleanpak International other than

4  Gladstone, so that Gladstone would have a chance to decide how much in kickbacks he

5  wanted to build into Tringali's quotes; (3) Moser's attempting to obtain a $20,000 kickback

6  from a contractor, and Moser and Gladstone's subsequent efforts to justify Moser's

7  misconduct; (4) Gladstone's submission of a false and misleading expense report, to get

8  reimbursement from Huntair, for an approximately $530 dinner in late March 2010, at which

9  Gladstone and Langer attempted to recruit other Huntair employees to join in the Reliant

10 scheme.  Gladstone hid the fact that Langer was at the dinner, and instead falsely indicated

11 that two other people were there; (5) Moser and Gladstone misleading and/or confusing

12 customers or potential customers who believed that Moser and Gladstone were working on

13 behalf of Huntair or Huntair's sister businesses when in fact Moser and Gladstone were

14 steering work to a business not affiliated with Huntair; and (6) Gladstone and Moser's behind-

15 the-scenes activities in competing against Huntair and in pursuing hundreds of thousands of

16 dollars of work for Reliant.

17                                      **PARTIES**

18      5.      CLPK, LLC is a Delaware limited liability company that has its principal place

19 of business in Tualatin, Oregon.  CLPK was formerly Cleanpak International, Inc.  CES

20 Group, Inc., a Delaware corporation that has its principal place of business in Minnesota, is

21 the sole member of CLPK.  At all pertinent times, Cleanpak International was engaged in the

22 business of selling air flow management systems and products, including cleanroom systems,

23 modular cleanrooms, and cleanroom-related components and products (such as fan filter units

24 ("FFUs"), ceiling grids, and cleanroom doors) through its Cleanpak and Servicor businesses

25 and/or brands.  In late 2009, Cleanpak International, Inc. transferred almost all of its assets to

26 Huntair.  Cleanpak International, Inc. was converted to a Delaware limited liability company

27 on April 26, 2010, at which time its name was changed to "CLPK, LLC."

28      6.      Huntair is a Delaware corporation that has its principal place of business in

1  Tualatin, Oregon.  Huntair is and at all pertinent times has been in the business of selling air

2  flow management systems and products typically used in the manufacturing processes of the

3  semiconductor, aerospace, biotech, and pharmaceutical industries.  Huntair – which has

4  acquired the rights to the Cleanpak, Cleanpak International, and Servicor names – sells and

5  has sold (among other things) cleanroom systems, including modular cleanrooms and

6  cleanroom-related services, components and products (including FFUs, ceiling grids, and

7  cleanroom doors) through its Cleanpak and Servicor businesses and/or brands.

8       7.    Gladstone is an individual who, on information and belief, is a citizen of the

9  State of California and who resides in San Mateo County, California.  At all times material

10  hereto, Gladstone was Servicor's National Sales Manager, first for Cleanpak International and

11  then for Huntair.  Gladstone became a Huntair employee on or about October 19, 2009.  As

12  National Sales Manager, Gladstone was directly responsible for overseeing Servicor sales both

13  in the United States and other countries, and also had primary responsibility for sales in the

14  western half of the United States.  Gladstone is, upon information and belief, the central

15  figure behind the kickback and other schemes and misconduct to defraud and to divert

16  business improperly from Plaintiffs.  Gladstone's employment with Huntair was terminated

17  on July 14, 2010.  A true and correct copy of Huntair's termination letter to Gladstone is

18  attached hereto and incorporated herein as Exhibit B.

19       8.    Moser is an individual who, on information and belief, is a citizen of the State

20  of Illinois and who resides in Ogle County in the State of Illinois.  Moser began his

21  employment with Cleanpak International in July 2006, and began his employment with

22  Huntair on or about October 19, 2009.  At all times material hereto, Moser was Regional Sales

23  Manager for the Servicor brand and, as such, was primarily responsible for Servicor sales in

24  the central and eastern portions of the United States.  Moser also reported directly to, and

25  worked closely with, Gladstone.  Moser has been integrally involved in the Reliant scheme and

26  other misconduct to defraud Huntair and improperly divert business from it.  Moser's

27  employment with Huntair was terminated on July 14, 2010.  A true and correct copy of

28  Huntair's termination letter to Moser is attached hereto and incorporated herein as Exhibit C.

1         9.     L4 Strategies is, and on information and belief at all times material hereto was, a

2 California corporation with its principal place of business in San Mateo, California. L4

3 Strategies was and is a co-conspirator with Gladstone and Moser in connection with the

4 Reliant scheme and, upon information and belief, was and is actively involved with Gladstone

5 and Moser in the plan to improperly divert business from Huntair. L4 Strategies does

6 business through Reliant. Reliant is a fictitious business name for the business used by

7 Gladstone, Moser, Langer, and L4 Strategies as part of the Reliant scheme.

8         10.     Langer on information and belief is an individual who is a citizen of the State of

9 California and who resides in San Mateo County, California. At all times material hereto,

10 Langer was the President of and/or played a principle role with L4 Strategies. At all relevant

11 times, Langer was a co-conspirator with Gladstone and Moser in connection with the Reliant

12 scheme and, upon information and belief, was and is actively involved with Gladstone and

13 Moser in the plan to improperly divert business from Huntair.

14         11.     Defendant Lorna Gladstone ("Ms. Gladstone") on information and belief is a

15 citizen of the State of California who resides in San Mateo County, California. Ms. Gladstone

16 is Gladstone's wife. Ms. Gladstone was a co-conspirator in, at a minimum, the kickback

17 scheme involving Tringali and Tringali Construction. Among other things, Ms. Gladstone

18 and her business, G-5 Group (also known as "G5 Group"), received kickbacks from Tringali.

19 In addition, Gladstone used G-5 Group as a vehicle to improperly compete against, and divert

20 business from, Huntair.

21         12.     The true names and capacities, whether individual, corporate, partnership,

22 associate, or otherwise, of defendants DOES 1 through 20 ("Doe Defendants"), inclusive, are

23 unknown to Plaintiffs, who therefore sue the Doe Defendants by such fictitious names.

24 Plaintiffs are informed and believe and, based thereon, allege that each of the Doe Defendants

25 is in some manner responsible for the events and happenings herein referred to, causing

26 damage to Plaintiffs as herein alleged. When Plaintiffs ascertain the true names and capacities

27 of the Doe Defendants it will ask leave of this Court to amend its Complaint to allege the true

28 names and capacities.

SL01DOCS3452236.8            5

1    13.   Gladstone and Ms. Gladstone on information and belief were and are the

2 agents, authorized representatives, joint venturers, partners, and/or alter egos of one another,

3 Tringali, Tringali Construction, and Custom Tinting (a fictitious business name used by

4 Gladstone) in connection with the Tringali scheme, and, in doing the acts alleged in this

5 Complaint pertaining to such scheme and misconduct, did so jointly and for a common

6 purpose, within the course and scope of his, her or its authority as such agent, representative,

7 joint venturer, partner, and/or alter ego, with the knowledge, consent, permission, and

8 ratification of each other.

9    14.   Gladstone, Moser, Langer and L4 Strategies on information and belief were and

10 are the agents, authorized representatives, joint venturers, partners, and/or alter egos of one

11 another and of Reliant in connection with the Reliant scheme, and, in doing the acts alleged in

12 this Complaint pertaining to such scheme and misconduct, did so jointly and for a common

13 purpose, within the course and scope of his or its authority as such agent, representative, joint

14 venturer, partner, and/or alter ego, with the knowledge, consent, permission, and ratification

15 of each other.

16    15.   Gladstone, Moser, Ms. Gladstone, L4 Strategies, Langer, and Doe Defendants

17 are collectively referred to herein as "Defendants."

18                    <u>**JURISDICTION & VENUE**</u>

19    16.   This Court has jurisdiction pursuant to 28 U.S.C. § 1338(a) because this case

20 arises under the federal RICO statute, 18 U.S.C. §§ 1961 <u>et seq</u>, and Section 43(a) of the

21 Lanham Act, 15 U.S.C. § 1125(a).

22    17.   This Court also has jurisdiction pursuant to 28 U.S.C. § 1332 because the

23 matter in controversy exceeds $75,000.00, exclusive of interest and costs, and is between

24 citizens of different states.

25    18.   This Court has supplemental jurisdiction over the state law claims for relief

26 herein under 28 U.S.C. § 1367(a).

27    19.   Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a

28 ///

1 | substantial part of the events or omissions giving rise to the claims herein occurred within this

2 | District.

3 | ## GENERAL ALLEGATIONS

4 |     20.    Gladstone and Moser were employed for Cleanpak International and then

5 | Huntair in sales-related capacities in connection with the Cleanpak and Servicor brands and

6 | businesses for a number of years.

7 |     21.    From at least January 1, 2007, through his termination in mid-July, 2010,

8 | Gladstone was the National Sales Manger for Cleanpak International and then Huntair's

9 | Servicor business.  As such, Gladstone had supervisory and oversight responsibility for

10 | (among other things) Servicor-related sales in the United States.  Gladstone's duties and

11 | responsibilities for Huntair and Cleanpak International included the development,

12 | management and guidance of sales activities, including managing sales opportunities, and

13 | seeking the expansion and growth of customers, for and on behalf of Huntair and Cleanpak

14 | International.

15 |     22.    From at least July 2006, through his termination in mid-July 2010, Moser was a

16 | Regional Sales Manager for Cleanpak International's and then Huntair's Servicor business, and

17 | as such was primarily responsible for Servicor-related sales in the central and eastern portions

18 | of the United States.  As Regional Sales Manager for Huntair and Cleanpak International,

19 | Moser generally was responsible for, inter alia, the overall regional representation of Huntair

20 | and Cleanpak International in sales for his designated regions in the United States.  Moser's

21 | responsibilities as a Servicor Regional Sales Manager for Huntair and Cleanpak International

22 | included establishing customer relationships, developing new customer contacts and

23 | identifying potential jobs, for and on behalf of Huntair and Cleanpak International.

24 | ## THE TRINGALI KICKBACK SCHEME

25 |     23.    Beginning in or about January 2007, and continuing until approximately

26 | September of 2009, Gladstone, Ms. Gladstone and Tringali engaged in a kickback scheme

27 | pursuant to which Gladstone and Ms. Gladstone were paid approximately $163,000 or more

28 | in kickbacks pertaining to Cleanpak International's Servicor-related projects, through checks

7

1   from Tringali made payable to Gladstone, Ms. Gladstone, G-5 Group and Custom Tinting.

2         (a)    The scheme tied into Servicor-related work that Tringali Construction

3   performed in connection with various Servicor-related projects which generally involved the

4   installation of cleanrooms and/or equipment, parts or services in connection therewith.

5   Gladstone initiated the kickback scheme, and Tringali agreed to and participated in it.

6         (b)    More specifically, while Gladstone was employed by Cleanpak

7   International, Gladstone inflated the costs that Tringali and/or Tringali Construction were

8   going to charge Cleanpak International/Servicor for cleanroom installations and related

9   services.  Then, after Tringali Construction was paid by Cleanpak International for the work,

10  Tringali would kick back the inflated portion to Gladstone.  Tringali estimates that from

11  January 2007 through September 2009, he kicked back approximately $163,000 to Gladstone

12  on Servicor projects as to which Gladstone had inflated Tringali's costs.

13        (c)    As part of the Tringali kickback scheme, Gladstone told Tringali that he

14  should not discuss pricing for potential projects with anyone at Cleanpak International other

15  than Gladstone.  Gladstone told Tringali, for example, that if Servicor's (i.e., Cleanpak

16  International's) Gary Adams ("Adams") were to call Tringali and ask Tringali for an estimate

17  or quote, Tringali should make up an excuse and tell Adams that he was busy, tied up, driving,

18  etc., and that he would get back to him.  Tringali was then to contact Gladstone and tell him

19  how much he would charge for the project.  Gladstone would then inflate Tringali's quote and

20  include the inflated amount in what Gladstone would then provide to Cleanpak

21  International/Servicor.  After Tringali did the work, Cleanpak International would pay

22  Tringali the inflated amount by check.  Tringali then would typically deposit the check from

23  Cleanpak International and shortly thereafter provide the kickback portion to Gladstone by

24  check.

25        (d)    As part of the scheme, Gladstone would tell Tringali to make the checks

26  payable to Gladstone, his wife Lorna, her company G-5 Group, or his business called Custom

27  Tinting.  Gladstone also told Tringali that the "G-5" in "G-5 Group" stands for

28  "Gladstone 5."  Tringali understood from Gladstone that "Gladstone 5" referred to

1  Gladstone, Ms. Gladstone, and their three children.

2        (e)    At least once Tringali had to void a kickback check because Gladstone

3  wanted it made payable to Gladstone personally rather than to G-5 Group.  More specifically,

4  with respect to Servicor's Berkeley Heartlab and Transphorm projects, Tringali kicked back

5  $7,500 to Gladstone.  Tringali originally made the $7,500 check payable to G-5 Group, but

6  voided the check because Gladstone wanted it made out to him personally.  Tringali then gave

7  Gladstone a check made payable to Gladstone personally, for $7,500.

8        (f)    As another example of Gladstone's scheme with Tringali, Tringali told

9  Gladstone that Tringali would do a Servicor cleanroom project in Hayward, California, for

10  $125,000.  Gladstone then inflated Tringali's quote to $175,000.  As a result, Cleanpak

11  International/Servicor ended up paying Tringali approximately $175,000, and Tringali paid

12  kickbacks totaling approximately $50,000 to Gladstone, Ms. Gladstone, G-5 Group and/or

13  Custom Tinting.

14        (g)    To help hide the scheme, Gladstone told Tringali that Tringali should

15  never tell Adams about Gladstone's business, Custom Tinting.  Gladstone also told Tringali

16  not to discuss with Adams or anyone else any of the payments that Tringali was making to

17  Gladstone, Ms. Gladstone, or their respective businesses.

18        (h)    There were other aspects of Gladstone's Tringali scheme as well.  For

19  example, Gladstone purchased two "Tringali Construction" stamps, and Gladstone then kept

20  one of the stamps for himself so that he could use it in submitting documents to Cleanpak

21  International/Servicor that supposedly were Tringali Construction documents but which in

22  fact had been created by Gladstone.

23        (i)    "Tringali Construction" invoices that were sent to Cleanpak

24  International/Servicor in connection with the Tringali scheme actually were prepared and sent

25  by Gladstone rather than Tringali.  Gladstone basically told Tringali that as soon as

26  Tringali/Tringali Construction was done with his/its work on a project, he should call

27  Gladstone, and Gladstone would then prepare and send to Cleanpak International/Servicor

28  the Tringali Construction invoice.

1         (j)    Gladstone kept files and documents pertaining to the scheme in his

2    house and/or in the office that he used on his property.  Gladstone's files and documents

3    included folders and notes containing information which showed how much he and

4    Tringali/Tringali Construction received and/or were to receive on various projects in

5    connection with the scheme.  On information and belief, Gladstone also had information on

6    one or more of his computers pertaining to the Tringali scheme.

7         (k)    Attached hereto as Exhibit D and incorporated herein are copies of

8    some check stubs pertaining to some of the kickback payments that Tringali made to

9    Gladstone through checks made payable by Tringali to Gladstone, his wife, G-5 Group or

10   Custom Tinting.  Check stubs 1206, 1226, 1227, 1228, 1235, and 1276 are tied to the kickback

11   scheme.

12   **THE PATTERN OF MISCONDUCT EXPANDS AND BRANCHES OUT**

13       24.    By at least the Fall of 2009, Gladstone and Moser were both engaged in other

14   misconduct as well.  For example, Moser attempted in or about August 2009 to obtain a

15   kickback in connection with work to be performed by Coombs Contracting.  Jim Coombs, of

16   Coombs Contracting, informed Adams that Moser had inflated, by approximately $20,000,

17   Coombs' quote to perform work on a Cleanpak International/Servicor cleanroom expansion

18   project for Ameridose.  Coombs was surprised that Moser had inflated Coombs' quote, and

19   also was concerned because Moser had suggested that Coombs could increase his pricing and

20   then later send a check to Moser for approximately $20,000 made payable to Moser

21   personally.

22       25.    Coombs' accountant warned Coombs that the arrangement was improper, and

23   Coombs then told Cleanpak International that the price was approximately $20,000 higher

24   than it was supposed to be.

25       26.    After Moser's conduct surfaced, Gladstone and Moser worked together in an

26   attempt to justify and gloss over what Moser had done, and to minimize the significance of

27   Moser's misconduct.

28

27.     During at least the last three months of 2009 and continuing into 2010, Gladstone was also engaged in selling cleanrooms and/or related equipment, products or services "on the side" while he was still employed by Cleanpak International or Huntair.  For example, on information and belief:

(a)     In September 2009, Gladstone agreed to disassemble a Servicor cleanroom, transport it to Flexline LLC ("Flexline") and re-assemble it for $3,600.  Gladstone made the arrangements using his Servicor email address and his Servicor "National Sales Manager" title.  However, Gladstone told Flexline to make the purchase order to G-5 Group.  Flexline then sent a purchase order dated September 11, 2009, to G-5 Group.

(b)     On or about October 2, 2009, Gladstone sent a proposal from G-5 Group to Touchdown Tech.  In the proposal, Gladstone offered to sell a cleanroom to Touchdown Tech for $22,000, along with some related HEPA filters for $1,900.  In the proposal, Gladstone told Touchdown Tech to coordinate all correspondence with Gladstone of "Servicor Clean Rooms," but to make the check payable to G-5 Group.

(c)     On or about February 22, 2010, Huntair/Servicor quoted on and then obtained a significant cleanroom project for LensVector.  Gladstone prepared and sent the quote.  Gladstone, however, did not include FFUs in his Huntair/Servicor quote for the LensVector work.  On information and belief, Gladstone provided the FFUs to LensVector through G-5 Group.  On or about February 22, 2010, G-5 Group prepared a quote to LensVector pertaining to the assembly of a Servicor cleanroom and the sale to LensVector of twenty-one FFUs in connection therewith.  The G-5 Group quote number ended in "S"; on information and belief, the "S" reflected "Seth" Gladstone's involvement in the proposal.  On or about March 15, 2010, G-5 Group purchased twenty-one FFUs from S-Cor Global Technologies ("S-Cor") for $550 per unit.  A true and correct copy of S-Cor's March 23, 2010 invoice for S-Cor's sale to G-5 Group is attached hereto and incorporated herein as Exhibit E.  As reflected in G-5 Group's March 15, 2010 Purchase Order to S-Cor (a copy of which is attached hereto as Exhibit F and incorporated herein), G-5 Group requested that S-Cor send the FFUs directly to LensVector and stated "[i]f you have any questions please call Seth

1  Gladstone of Servicor . . . . He is coordinating the clean room project for LensVector." G-5
2  Group then charged LensVector approximately $43,773 for the FFUs and related installation
3  services (which such services were provided, on information and belief, by Gladstone's
4  brother-in-law Daniel Emrick, who sometimes does business as Emrick Improvement
5  Contractors or DRE Contracting (collectively, "Emrick")). Thus, LensVector purchased
6  FFUs and related installation services, for a Huntair/Servicor cleanroom project, from
7  Gladstone's G-5 Group rather than Huntair/Servicor.

8          (d)    In addition, LensVector asked Gladstone, in connection with the
9  LensVector project, to provide some structural drawings. Huntair followed up and Gladstone
10 was provided with a quote from Allstructure Engineering LLC for the requested work.
11 Huntair expected to receive a purchase order from LensVector for the drawings. Instead,
12 Gladstone used G-5 Group to obtain the drawings from Allstructure Engineering. On
13 information and belief, Gladstone provided or made arrangements to provide the drawings to
14 LensVector through G-5 Group, and G-5 Group then charged LensVector.

15                              **THE RELIANT SCHEME**

16     28.    By at least February or March of 2010, Gladstone, Ms. Gladstone, Moser,
17 Langer, and L4 Strategies were engaged in a scheme to divert business from Huntair through
18 a business that ultimately was named Reliant. In February 2010, for example, Gladstone, Ms.
19 Gladstone, Moser, Langer and L4 Strategies on information and belief were involved in the
20 selection of a logo for Reliant's business.

21     29.    In addition, Gladstone and Moser were also involved in February 2010 in
22 preparing and/or reviewing the Reliant "quote" form and Reliant's Standard Terms and
23 Conditions of Sale. On information and belief, Reliant's "Standard Terms" were taken from
24 G-5 Group's Standard Terms and Conditions. On information and belief, Gladstone
25 provided the "standard terms and conditions" for Reliant to use with its quotes to potential
26 customers, and Reliant subsequently included G-5 Group's "standard terms and conditions"
27 with quotes that Reliant sent to potential customers.

28

1      30.     By late February and early March 2010, the Reliant scheme and other

2 misconduct were well underway. In late February 2010, for example, Reliant prepared a quote

3 for cleanroom components and assembly to Williams Advanced Materials ("Williams"). The

4 Reliant quote number has "SM" at the end of it. "SM" are also the initials for Steve Moser's

5 name, and when Moser prepared quotes for Servicor, he normally put his initials, "SM," after

6 the quote number. Reliant prepared another quote to Williams in early March 2010. The

7 number for this quote also has "SM" at the end of it.

8      31.     Moser was actively involved in steering the Williams cleanroom-related business

9 away from Huntair/Servicor to Reliant. On information and belief, Moser told Williams that

10 Moser could split the business between Servicor and Reliant; that Williams could issue

11 separate purchase orders to Servicor and Reliant; and that Moser would oversee and manage

12 the entire project, including Reliant's portion of it. In addition, Moser on information and

13 belief was directly involved in arranging for the products and services that Reliant provided to

14 Williams, including the installation services provided by Gladstone's brother-in-law, Emrick.

15      32.     Reliant also prepared quotes dated March 18, 2010, for Sage Science regarding

16 "Servicor Softwall Cleanroom Assembly," and for Instrumentation Labs regarding "Servicor

17 Gown Room Assembly." Both Reliant quote numbers end with "SM " – Steve Moser's

18 initials.

19      33.     On or about March 19, 2010, Huntair/Servicor provided a quote to Allaway

20 Enterprises LLC ("Allaway") for a modular cleanroom, including 100 FFUs. Reliant prepared

21 a quote to Allaway dated April 12, 2010, regarding cleanroom components and assembly,

22 which included 24 FFUs. The Reliant quote number ends with "SM."

23      34.     On information and belief, during Moser's employment with Huntair, Reliant

24 provided a number of quotes to potential customers that have quote numbers that end with

25 "SM." At least several of the "SM" quotes resulted, on information and belief, in purchase

26 orders to Reliant – again, while Moser was still employed with Huntair.

27      35.     In mid-March 2010, Reliant diverted business away from Huntair in connection

28 with a Servicor cleanroom project for Heraeus Quartz ("Heraeus"). Moser was involved in

1  the Heraeus project on behalf of Huntair/Servicor.  Huntair/Servicor provided the cleanroom
2  to Heraeus, but not the FFUs or installation services.  On or about March 19, 2010, Reliant
3  on information and belief submitted a quote to Heraeus to provide "cleanroom design
4  engineering and assembly" for $10,075.  The Reliant quote ended with "SM" – Steve Moser's
5  initials.  Heraeus then issued a purchase order to L4 Strategies dated March 22, 2010, for
6  $10,075, tied to Reliant's "SM" quote, for the "development/installation of clean room."

7      36.    When Heraeus raised a question during a subsequent telephone call with Moser
8  and other Huntair management personnel pertaining to who was responsible for the
9  installation work on the Heraeus project, Moser deflected the question in order to avoid
10  highlighting to Huntair's management that Reliant was doing the installation work.

11      37.    On or about March 24, 2010, Gladstone solicited two Huntair employees, Gary
12  Adams and Eric Nelson, to join the Reliant scheme.  Gladstone's pitch included, among other
13  things, promises that Adams and Nelson could receive substantial monies if they were to join
14  Gladstone, Langer and Moser in a scheme that would be run through Langer's business,
15  Reliant.  As set forth in more detail below, Gladstone's Reliant scheme involved
16  Langer/Reliant kicking back to Adams, Nelson, Gladstone and Moser, commissions and/or a
17  percentage of the profits that Langer/Reliant made on its sales.

18      38.    Gladstone explained the Reliant scheme generally as follows:

19          (a)    Gladstone and Moser would tell the Huntair/Servicor customers and
20  potential customers that the customers/potential customers could purchase cleanroom-related
21  products and services such as FFUs, doors, installations, and replacement components less
22  expensively through a vendor such as Langer/Reliant, rather than through Huntair.
23  Gladstone or Moser would help the customer/potential customer coordinate the deal with
24  Langer/Reliant.  Gladstone and Moser essentially would help Langer/Reliant get business
25  from Huntair's customers and potential customers by steering them to Langer/Reliant and by
26  otherwise helping to facilitate the sales by Reliant.

27          (b)    Langer/Reliant then would pay Gladstone, Moser, Adams and Nelson
28  on the cleanrooms and other products, equipment and services that Langer/Reliant sold.

(c)     Gladstone told Adams and Nelson that everyone had to be in, or the arrangement would not work.  Gladstone also made clear that Moser knew what was going on and had agreed to the plan.

(d)     In "justifying" his plan, Gladstone said that the compensation had been reduced at Huntair, and Gladstone's plan would help make up for it.

(e)     During the discussions, Gladstone emphasized that the plan would work, and suggested that it was not that big of a deal and that they would not get caught.  Gladstone also explained that the payments from Langer/Reliant could be paid to Gladstone, Moser, Nelson and Adams' wives or other family members so that the payments could not be traced back to Gladstone, Moser, Nelson or Adams.

(f)     Gladstone also indicated that the Servicor business was such a small concern to Huntair's parent company, CES Group, that CES would never notice if products and services were skimmed away from jobs on a limited basis.  Gladstone further indicated that the jobs and customers would be carefully targeted for inclusion in the plan so as not to raise suspicion.  Langer would be Reliant's "front man" or "face," and the remaining participants (i.e., Gladstone, Moser, and the other Huntair employees) would remain anonymous.

39.     Much of Gladstone's initial pitch to get Nelson and Adams to agree to participate in the Reliant scheme was made during a dinner that Langer attended on March 24, 2010, at a restaurant in San Mateo County, California.  Gladstone submitted a false expense report and a falsified dinner receipt for the $530 dinner to Huntair in order to get reimbursed by Huntair for the dinner.  Gladstone's expense report and restaurant receipt to Huntair falsely indicated that certain people were at the dinner, and also failed to note that Langer was there.  Huntair reimbursed Gladstone for the dinner.

40.     Following the March 24, 2010, discussions, Gladstone asked Nelson to send Gladstone the home addresses and the home or personal email addresses for Nelson, Adams, and another Huntair employee named Wayne Larson.  Nelson understood that Gladstone wanted this information so that Langer/Reliant, Gladstone and others involved in the scheme

1   could communicate without Huntair finding out and so that Langer/Reliant could send things
2   – including payments – to Adams, Larson and Nelson at their home addresses.

3       41.    Within one or two months after the March 24, 2010, meeting, Moser discussed
4   the Reliant scheme by telephone with Nelson. Moser indicated to Nelson that everyone
5   involved with the Reliant scheme would make money, and that there was a lot of money to be
6   made. Moser also indicated that they would have to be cautious so that Adams would not
7   ruin it for everyone.

8       42.    Adams and Nelson did not join the Reliant scheme, but Gladstone and Moser,
9   in concert with Langer and L4 Strategies (and perhaps others), and through Reliant,
10  implemented the scheme anyway and improperly diverted business away from Huntair.

11      43.    On information and belief, Gladstone and Moser communicated between
12  themselves and with others through use of Gladstone and Moser's personal and/or other
13  non-Servicor e-mail addresses to hide their misconduct – including in connection with
14  communications to and from (a) Langer/Reliant and (b) Mike Shea ("Shea") of S-Cor.

15      44.    The full extent of the Reliant scheme is unknown at this time, but on
16  information and belief also includes the following:

17      (a)    Huntair submitted a quote to AquaPhoenix Scientific ("AquaPhoenix")
18  dated January 26, 2010, with respect to a modular cleanroom. Moser was involved in the
19  proposal on behalf of Huntair. Reliant also prepared a quote to AquaPhoenix for some
20  cleanroom components; Reliant's quote to AquaPhoenix was dated March 30, 2010, and
21  Reliant's quote number ended with "SM."

22      (b)    On or about March 29, 2010, Martek Biosciences ("Martek") on
23  information and belief issued either one or two purchase orders to Reliant, for $59,548 and/or
24  $37,150. The purchase orders pertained to a Reliant quote dated March 25, 2010, with a
25  quote number ending in "SM." In addition, Martek issued a purchase order to Huntair dated
26  March 29, 2010. The Martek purchase order(s) to Reliant was PO # 908261; the Martek
27  purchase order to Huntair was PO # 908262. On April 1, 2010, Martek sent an email to
28  Moser telling Moser that "hopefully you've received the formal POs." On information and

1   belief, (1) Moser submitted one or more quotes to Martek from both Huntair <u>and</u> Reliant; and

2   (2) Moser was involved in obtaining the Martek business for Reliant.

3             (c)     In or about March 2010, Moser was dealing with Phil Braun ("Braun")

4   of Doe & Ingalls on a possible project pursuant to which Huntair/Servicor would have

5   provided a cleanroom and related parts and installation services. When Braun was talking

6   with Moser about the possibility that Doe & Ingalls might want to purchase just the

7   equipment but not the installation, Moser indicated that "we" provide the equipment through

8   another company, Reliant. On information and belief, Moser subsequently sent several

9   Reliant quotes in the March-May 2010 timeframe to Doe & Ingalls. Each of the Reliant

10  quotes had quote numbers ending with "SM." Based on Moser's statements and actions,

11  Braun was under the mis-impression that Reliant was part of, or affiliated with, Huntair.

12            (d)     Reliant sent a quote dated April 12, 2010, for more than $104,000 to

13  Allaway. The Reliant quote – which had a quote number ending with "SM" -- pertained to the

14  providing of cleanroom power doors and related services. Reliant's April 12, 2010, quote also

15  included the G-5 Group Standard Terms and Conditions of Sale. Reliant sent another quote

16  to Allaway, dated May 26, 2010, for more than $180,000.

17            (e)     In pursuing Allaway, Moser was basically peeling work away from

18  Huntair in order to divert it to Reliant. For example, Moser prepared and sent Allaway <u>two</u>

19  quotes dated April 12, 2010 – one for Huntair/Servicor and one for Reliant. The quote

20  numbers were identical -- # 100412 SM. Moser led Allaway to believe, incorrectly, that Reliant

21  was affiliated with Huntair and that Reliant handled installation aspects of Huntair's Servicor-

22  related projects, with Huntair's knowledge and/or approval. Similarly, Moser sent Allaway

23  two quotes dated May 26, 2010 – again, one from Huntair/Servicor and one from Reliant,

24  with Moser again splitting the work.

25            (f)     On April 14, 2010, Moser sent an email to NC State University. Moser's

26  email attached two proposals, one from Huntair/Servicor and the other from Reliant. Both

27  proposals were dated April 14, 2010, and both proposals had the same quote number, i.e.,

28  100414SM. The subject line of Moser's April 14 email referred to "Servicor hardwall

1  cleanroom and assembly proposals." Moser sent the email and attachments as the Regional

2  Sales Manager, Servicor Clean Rooms. Moser sent the email, however, from his personal

3  email address, and on information and belief did so in order to hide his Reliant-related

4  misconduct from Huntair. Moser's April 14, 2010, quote to NC State University from Reliant

5  was in the amount of $25,098.

6          (g)    Moser led NC State University to believe that Reliant was a part of, or

7  was working or affiliated with, Huntair/Servicor. Moser thus was attempting to divert

8  business from Huntair to Reliant, and was doing so in part by (1) misleading and/or confusing

9  the potential customer into believing that Huntair was somehow working or affiliated with

10  Reliant, and (2) by promoting Reliant, even though Moser was supposed to be acting on

11  Huntair's behalf as its Regional Sales Manager;

12          (h)    In early May 2010, Gladstone worked with Langer in connection with a

13  Reliant quote to Modified Polymers. On May 3, 2010, Gladstone communicated by email

14  with Modified Polymers as "National Sales Manager, Servicor Clean Rooms." Gladstone,

15  however, provided Modified Polymers with a quote from Reliant. Langer was copied on

16  Gladstone's email.

17          (i)    Huntair sold a cleanroom to Williams Advanced Materials in March

18  2010. Moser was the Huntair/Servicor salesperson primarily responsible for the sale.

19  However, Huntair's sale to Williams did not include any FFUs or the cleanroom installation

20  work. On or about May 20, 2010, Reliant purchased fifteen (15) FFUs from S-Cor at the

21  price of $550 per unit. A true and correct copy of S-Cor's invoice for the sale to Reliant is

22  attached hereto and incorporated herein as Exhibit G. In the related Purchase Order from

23  Reliant (a copy of which is attached hereto as Exhibit H and incorporated herein), Reliant

24  directed S-Cor to ship the FFUs to Williams. On information and belief, Emrick performed

25  the installation work on the Williams project. On information and belief, the splitting of the

26  cleanroom project confused Williams, which thought that Huntair/Servicor was providing the

27  FFUs and the related installation work.

28          (j)    On or about May 21, 2010, Reliant purchased twenty-four (24) FFUs

1   from S-Cor at the price of $550 per unit.  A true and correct copy of S-Cor's invoice for the
2   sale to Reliant is attached hereto and incorporated herein as Exhibit I.  In its purchase order,
3   Reliant directed S-Cor to ship the FFUs to Martek.  A true and correct copy of Reliant's
4   purchase order is attached hereto and incorporated herein as Exhibit J.  Moser did not include
5   FFUs in his Huntair/Servicor quote for the Martek project.

6       45.     Moser and Gladstone used the U.S. mail and telephonic communications to
7   effectuate their schemes.  For example, the Tringali scheme included:  Gladstone and Tringali
8   communicating by phone regarding quotes that Gladstone was going to inflate as part of the
9   kickback scheme; Tringali, at Gladstone's direction, fabricating excuses on the telephone
10  when Adams called, so that Gladstone could handle Tringali's pricing himself; and invoices
11  and/or checks being sent by mail as a part and/or result of the fraudulent and misleading
12  information provided by Gladstone in connection with the scheme.  Similarly, the Reliant
13  scheme included Gladstone and Moser talking by telephone with customers and/or potential
14  customers in connection with the attempts to divert business away from Huntair; and invoices
15  and/or checks being sent by mail as a part and/or result of the Defendants' fraudulent and
16  improper activities.  In addition, Gladstone and Moser also spoke by telephone with Nelson
17  as part of the Reliant scheme.  Gladstone, for example, spoke by telephone with Nelson as
18  part of an effort to keep Huntair from learning about the scheme.  Moser discussed by
19  telephone with Nelson that everyone involved in the Reliant scheme would make money, and
20  that there was a lot of money to be made.

21                           **OTHER MISCONDUCT**

22      46.     On information and belief, Gladstone improperly inflated one or more quotes
23  of at least one other contractor, i.e., his brother-in-law Emrick.  On May 27, 2010, Emrick
24  submitted a quote of $5,950 for an installation pertaining to a potential Huntair/Servicor-
25  related project for Voltage Multipliers.  Gladstone on information and belief inflated Emrick's
26  quoted installation cost from $5,950 to $7,500, and then increased the proposed sell price to
27  $12,500.  In light of (among other things) Gladstone's conduct in connection with the Tringali
28  and Reliant schemes, Huntair believes and therefore alleges that Gladstone was increasing

1   Emrick's costs as part of a kickback arrangement.

2       47.     Gladstone and Moser's conduct relating to the Reliant scheme and G-5 Group

3   violated Huntair's Code of Ethics and Business Conduct ("Code of Conduct") in numerous

4   respects.  A copy of Huntair's Code of Conduct is attached hereto as Exhibit K and

5   incorporated herein.

6       48.     The full extent of the misconduct of Gladstone, Ms. Gladstone, Moser, Langer,

7   L4 Strategies and the other Defendants relating to Gladstone and Moser's employment with

8   Huntair and Cleanpak International is not yet known.  Gladstone and Moser were told in late

9   June 2010, to cooperate fully and to be completely truthful in connection with Huntair's

10  investigation relating to Gladstone and Moser's activities.  They failed to do so.

11      49.     Gladstone and Moser lied to and misled Huntair in connection with its

12  investigation into their misconduct.  For example, Gladstone falsely claimed that (a) he never

13  received any kickbacks from Tringali, and, instead, that Tringali's payments were merely

14  reimbursements for $50,000 to $100,0000 in loans that Gladstone, Ms. Gladstone, G-5 Group

15  and/or Custom Tinting supposedly had made to Tringali; and (b) G-5 Group was

16  Ms. Gladstone's company, and that he had had no involvement in G-5 Group and that it had

17  never been involved in providing cleanroom-related products or services.  In addition, both

18  Gladstone and Moser denied and/or downplayed their knowledge of and involvement in

19  Reliant's business.  Neither Gladstone nor Moser disclosed, for example, their involvement in

20  preparing and sending Reliant quotes to Servicor's customers and potential customers.

21      50.     Gladstone and Moser were terminated by Huntair on or about July 14, 2010.

22  Following their terminations, they continued to pursue business for Reliant and, in doing so,

23  misled at least one customer as to the nature of their relationship with, and whether they were

24  still affiliated with, Servicor.

25                          **FIRST CAUSE OF ACTION**

26              **(Breach of Duty of Loyalty Against Gladstone and Moser)**

27  **(Conspiracy Against Moser, Gladstone, Ms. Gladstone, L4 Strategies and Langer)**

28      51.     Plaintiffs incorporate by reference paragraphs 1 through 50 above as though

1  fully set forth herein.

2       52.   Gladstone and Moser, by virtue of their managerial-level sales positions, were
3  employed in positions of trust and confidence.  They owed, as both employees and managers,
4  a duty of loyalty to Plaintiffs during their employment with such Plaintiffs.

5       53.   Gladstone breached his duties of loyalty to Cleanpak International (now CLPK)
6  and Huntair by, among other things, (a) engaging in the Tringali scheme, including by inflating
7  Tringali's quotes, submitting the inflated costs to Cleanpak International, and then receiving
8  kickbacks based upon the inflated costs; (b) organizing and implementing the Reliant scheme;
9  (c) diverting and attempting to divert business away from Huntair in connection with the
10  Reliant scheme; (d) on information and belief, receiving kickbacks, commissions and/or other
11  compensation or benefits on sales by Reliant and G-5 Group; (e) failing to advise Huntair that
12  its Regional Sales Manager (Moser) was involved in improper activities; (f) soliciting other
13  Huntair employees to participate in the Reliant scheme; (g) failing to perform services for
14  Huntair during the times that he was being paid to provide full-time services; (h) spending
15  time during regular business hours performing work for the benefit of Reliant, G-5 Group,
16  himself and/or others; (i) using Huntair's confidential information as to leads, quotes, pricing
17  and profit margins to his own advantage and to the advantage of others; and (j) lying to and
18  misleading Huntair, and by failing to cooperate, in connection with Huntair's investigation.

19       54.   Moser breached his duties of loyalty to Cleanpak International and Huntair by,
20  among other things, (a) attempting to obtain a kickback from Coombs Contracting; (b)
21  helping a competitor (Reliant) compete against Huntair, and diverting business away from
22  Huntair, in connection with the Reliant scheme; (c) on information and belief, receiving
23  kickbacks, commissions and/or other compensation or benefits on sales by Reliant; (d) failing
24  to perform services for Huntair during the times that he was being paid to provide full-time
25  services; (e) spending time during regular business hours performing work for and on behalf
26  of Reliant, Gladstone and himself; (f) using Huntair's confidential information as to leads,
27  quotes, pricing and profit margins to his own advantage and to the advantage of others; and
28  (g) lying to and misleading Huntair, and by otherwise failing to cooperate, in connection with

1  Huntair's investigation.

2      55.   Gladstone, Tringali, and Ms. Gladstone on information and belief conspired
3  and agreed amongst themselves to participate in the Tringali scheme in furtherance of
4  Gladstone's breach of his duty of loyalty to Cleanpak International.  Gladstone and Tringali
5  knowingly and willfully conspired and agreed to engage in the kickback scheme in or about
6  early 2007; the exact date of Ms. Gladstone's agreement is not yet known, but it may be
7  inferred by the conduct of the parties.  At some point during the kickback scheme,
8  Ms. Gladstone on information and belief became aware of and knowingly participated in the
9  scheme, because Gladstone told Tringali to make some of the kickback checks payable to
10  Ms. Gladstone and/or G-5 Group (which Gladstone has said is his wife's business).  On
11  information and belief, since kickback checks were made payable to Ms. Gladstone and her
12  business, Ms. Gladstone cooperated in the scheme by endorsing and/or depositing the
13  checks, and/or by helping to make it harder to trace the payments to Gladstone.  The
14  conspiracy pertaining to the Tringali scheme continued until at least approximately September
15  of 2009, and Gladstone's efforts to conceal the scheme continued through at least June 2010.

16      56.   Gladstone, Moser, L4 Strategies and Langer on information and belief
17  knowingly and willingly conspired and agreed among themselves, by at least February or
18  March 2010, if not sooner, to engage in the Reliant scheme in breach of Gladstone and
19  Moser's duties of loyalty to Huntair.  Their conspiracy essentially consisted of their agreeing to
20  divert business and opportunities improperly and fraudulently from Huntair to Reliant and/or
21  others, and to conceal their misconduct from Huntair, all as alleged in more detail above.

22      57.   The Defendants participating in the conspiracies, aware that the acts they were
23  conspiring to commit were tortious, nevertheless furthered their conspiracies by, among other
24  things, encouraging the tortious acts of one another.

25      58.   Gladstone and Moser's breaches of their duties of loyalty have directly and
26  proximately caused damage to, and are continuing to damage, Plaintiffs.  Such damages
27  include, but are not limited to, the loss of income and opportunities; the value of the
28  compensation and benefits that Gladstone and Moser were paid and/or otherwise received

1  from Cleanpak International and Huntair from the time that Gladstone and Moser first

2  started breaching their respective duties; the diminution in the value of Plaintiffs' businesses;

3  the inflated amounts paid to Tringali Construction; the profits or other compensation

4  received by Gladstone, Moser, Langer, L4 Strategies and/or anyone else involved in the

5  Reliant scheme; and the costs pertaining to Huntair's investigation, all in amounts to be

6  established according to proof.

7      59.    Gladstone and Moser acted with oppression, fraud and/or malice in breaching

8  their duties of loyalty, and they, Ms. Gladstone, L4 Strategies, and Langer acted with

9  oppression, fraud and malice in furtherance of their conspiracies.  Plaintiffs are thus entitled

10 to awards of punitive damages against Gladstone, Ms. Gladstone, Moser, L4 Strategies, and

11 Langer.

12                           **SECOND CAUSE OF ACTION**

13                    **(Fraud and Deceit Against Gladstone and Moser)**

14  **(Conspiracy Against Moser, Gladstone, Ms. Gladstone, L4 Strategies and Langer)**

15      60.    Plaintiffs incorporate by reference paragraphs 1 through 59 above as though

16 fully set forth herein.

17      61.    Gladstone and Moser engaged in fraudulent and deceitful activities in

18 connection with their misconduct as alleged above.  Gladstone and Moser's fraudulent and

19 deceitful conduct includes, but is not limited to:

20          (a)    Gladstone's failure to disclose the Tringali scheme to Cleanpak

21 International and Huntair;

22          (b)    Gladstone's efforts to keep Cleanpak International and Huntair from

23 learning about the Tringali scheme;

24          (c)    Gladstone's failure to disclose, and his concealment of, his involvement

25 in G-5 Group and the activities of G-5 Group pertaining to the cleanroom business;

26          (d)    Gladstone's failure to disclose to Huntair management his relationship,

27 and the full scope of his cleanroom-related activities, with Emrick;

28          (e)    Gladstone and Moser's failures to disclose the Reliant scheme to

1   Huntair; and

2           (f)     Gladstone and Moser's efforts to keep Huntair from learning about the
3   Reliant scheme.

4       62.    In addition, when Gladstone and Moser provided Huntair with quotes
5   pertaining to projects or potential projects that they were trying to steer partially to Reliant, G-
6   5 Group or Emrick, they provided less-than-complete information to Huntair. They failed to
7   disclose to, and concealed from, Huntair that additional business was or might be available –
8   business that Gladstone and Moser were siphoning off for themselves, Reliant and G-5
9   Group. On information and belief, Gladstone and Moser expected and intended that Huntair
10  would rely and act on the incomplete information, since Huntair did not have the benefit of
11  all the information that Gladstone and Moser had.

12      63.    Gladstone and Moser had a duty to disclose the above, and their failures to do
13  so constitute fraud and deceit. The information they failed to disclose would have been
14  material to Cleanpak International and Huntair.

15      64.    Cleanpak International and Huntair reasonably relied on Gladstone and Moser
16  disclosing that which they should have disclosed. By fraudulently concealing that which they
17  should have disclosed, Gladstone and Moser damaged Cleanpak International and Huntair.

18      65.    Gladstone and Moser's fraudulent and deceitful activities also include, but are
19  also not limited to: (a) Gladstone submitting Tringali invoices to Cleanpak International that
20  appeared to have been prepared by Tringali Construction but which actually had been
21  prepared by Gladstone and which contained Gladstone's inflated pricing; (b) Gladstone
22  submitting cost calculations and/or estimates to Cleanpak International and Huntair which
23  contained inflated pricing; (c) Gladstone's submission of a false and misleading expense report
24  for a dinner with Langer at which Gladstone attempted to recruit other Huntair employees to
25  join the Reliant scheme; and (d) Moser submitting to Cleanpak International an inflated quote
26  for work to be performed by Coombs Contracting.

27      66.    In addition, as part of their fraudulent and deceitful activities, Gladstone and
28  Moser misled Huntair into believing that they were acting on Cleanpak International and

1  Huntair's behalf when, in fact, (a) they were acting in their own self interests and the interests
2  of others; and (b) they were diverting business and opportunities from Huntair to others such
3  as Reliant, G-5 Group and Emrick.

4      67.    Plaintiffs were unaware of Gladstone and Moser's fraudulent and deceitful
5  conduct. Plaintiffs reasonably relied on the accuracy and completeness of the information
6  that Gladstone and Moser provided with respect to the projects and potential projects they
7  were pursuing and/or supposed to be pursuing on behalf of Cleanpak International and/or
8  Huntair.

9      68.    Gladstone, Tringali, and Ms. Gladstone on information and belief conspired
10  and agreed amongst themselves to participate in the Tringali scheme in furtherance of
11  Gladstone's fraudulent and deceitful conduct, including, but not limited to, in connection with
12  (i) the payment of kickbacks to Ms. Gladstone and G-5 Group, (ii) Gladstone's failure to
13  disclose the Tringali scheme to Cleanpak International, (iii) his efforts to keep Cleanpak
14  International from learning about the Tringali scheme, and (iv) Gladstone's failure to disclose,
15  and his concealment of, his involvement in G-5 Group. Gladstone and Tringali knowingly
16  and willfully conspired and agreed to engage in the kickback scheme in or about early 2007;
17  the exact date of Ms. Gladstone's agreement is not yet known, but it may be inferred by the
18  conduct of the parties. At some point during the kickback scheme, Ms. Gladstone on
19  information and belief became aware of and knowingly participated in the scheme, because
20  Gladstone told Tringali to make some of the kickback checks payable to Ms. Gladstone
21  and/or G-5 Group (which Gladstone has said is his wife's business). On information and
22  belief, since kickback checks were made payable to Ms. Gladstone and her business,
23  Ms. Gladstone cooperated in the scheme by endorsing and/or depositing the checks, and/or
24  by helping to make it harder to trace the payments to Gladstone. The conspiracy pertaining
25  to the Tringali scheme continued until at least approximately September of 2009, and
26  Gladstone's efforts to conceal the scheme continued through at least June of 2010.

27      69.    Gladstone, Moser, L4 Strategies and Langer on information and belief
28  knowingly and willingly conspired and agreed among themselves, by at least February or

1  March 2010, if not sooner, to engage in the Reliant scheme in furtherance of Gladstone and

2  Moser's fraudulent and deceitful conduct, including, but not limited to, in connection with (i)

3  the manner in which the scheme would operate, (ii) Gladstone and Moser's failures to disclose

4  the Reliant scheme to Huntair, and (iii) Gladstone and Moser's efforts to keep Huntair from

5  learning about the Reliant scheme.

6          70.     The Defendants participating in the conspiracies, aware that the acts they were

7  conspiring to commit were tortious, nevertheless furthered their conspiracies by, among other

8  things, encouraging the tortious acts of one another.

9          71.     Gladstone and Moser's fraudulent and deceitful conduct, and the conspiracies

10 relating thereto, damaged and is continuing to damage Plaintiffs.  Plaintiffs' damages include,

11 but are not limited to, the inflated amounts paid to Tringali Construction; the loss of income

12 and opportunities that were diverted to Gladstone, G-5 Group, and/or Reliant; and the costs

13 pertaining to Huntair's investigation.

14         72.     Gladstone and Moser acted with oppression, fraud and/or malice in pursuing

15 their fraudulent and deceitful activities, and they, Ms. Gladstone, L4 Strategies, and Langer

16 acted with oppression, fraud and malice in furtherance of their conspiracies.  Plaintiffs are

17 thus entitled to awards of punitive damages against Gladstone, Ms. Gladstone, Moser, L4

18 Strategies, and Langer.

19                          **THIRD CAUSE OF ACTION**

20             **(Intentional Interference with Prospective Economic Advantage)**

21           **(Against Defendants Gladstone, Moser, Langer and L4 Strategies)**

22         73.     Plaintiffs incorporate by reference paragraphs 1 through 72 above as though

23 fully set forth herein.

24         74.     Huntair has and had developed and cultivated valuable and advantageous

25 economic relationships with its customers and prospective customers.  These relationships

26 exist and/or existed between Huntair and the customers and prospective customers with

27 whom Gladstone and Moser were dealing on Huntair's behalf, and include Huntair/Servicor

28 customers and prospective customers (such as Williams, Haraeus, Martek, AquaPhoneix, Sage

1  Science, Allaway, and Doe & Ingalls) that Gladstone, Moser and Reliant (including Langer and
2  L4 Strategies) were pursuing in connection with the Reliant scheme and/or that Gladstone
3  was dealing with in connection with his efforts to steer business to himself and/or G-5 Group
4  (such as LensVector).

5      75.    Gladstone, Moser, Langer and L4 Strategies intentionally, wrongfully, and
6  without justification interfered with Huntair's prospective economic relationships with
7  Huntair's customers and potential customers.  For example, Langer and L4 Strategies, in
8  conjunction and in concert and participation with Moser and Gladstone, improperly and
9  without justification diverted business and business opportunities from Huntair through
10  Gladstone and Moser's breaches of their duties of loyalty and/or their fraudulent and
11  deceitful conduct.  Gladstone and Moser knew of Huntair's relationships with Huntair's
12  customers and prospective customers; Gladstone and Moser engaged in intentional, wrongful
13  acts; and they knew that interference was substantially certain to occur as a result of their
14  actions.

15      76.    As a direct and proximate result of Gladstone, Moser, Langer and L4 Strategies'
16  wrongful interference, Huntair has suffered damage in the form of lost income and
17  opportunities from these prospective economic relationships, in an amount to be established
18  according to proof at trial.

19      77.    Gladstone, Moser, Langer and L4 Strategies acted with oppression, fraud,
20  and/or malice in wrongfully interfering with Huntair's prospective economic relationships.
21  Huntair is thus entitled to awards of punitive damages against such Defendants.

22                        **FOURTH CAUSE OF ACTION**

23              **(Racketeering - 18 U.S.C. § 1962(c) (RICO))**

24      **(Against Moser, Gladstone, Ms. Gladstone, L4 Strategies and Langer)**

25      78.    Plaintiffs incorporate by reference paragraphs 1 through 77 above as though
26  fully set forth herein.

27      79.    Gladstone, Tringali, and Ms. Gladstone constituted and were engaged in an
28  enterprise (the "Gladstone/Tringali enterprise") within the meaning of the federal RICO

1  statute, 18 U.S.C. §1961 et seq., including specifically 18 U.S.C. §1962(c).  Gladstone, Tringali,

2  and Ms. Gladstone each is a "person" who was associated with the Gladstone/Tringali

3  enterprise, and they were associated-in-fact.

4       80.    The Gladstone/Tringali enterprise engaged in and had an effect on interstate

5  commerce.  The Gladstone/Tringali enterprise, for example, resulted in business being

6  conducted between Cleanpak International (based in Oregon) and Tringali Construction with

7  respect to various projects located in California; it also resulted in monies being sent in

8  interstate commerce.

9       81.    Gladstone, Tringali and Ms. Gladstone each knowingly and willfully conducted

10  and/or participated, directly or indirectly, in the conduct of the Gladstone/Tringali

11  enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C.

12  §1962(c).

13       82.    Between January 1, 2007, and approximately September of 2009, Gladstone,

14  Tringali and Ms. Gladstone knowingly and willfully committed, or knowingly and willfully

15  aided in the commission of, two or more predicate offenses that constitute the pattern of

16  racketeering activity, and each knowingly and willfully received income derived, directly or

17  indirectly, from such pattern of racketeering activity.  Such predicate acts include, but are not

18  limited to, violations of the mail fraud and wire fraud statutes within the meaning of 18 U.S.C.

19  §§1961(1) and 1962(c), through the use of the mail and of the telephone as described in this

20  Complaint.

21       83.    The predicate acts all occurred after the effective date of the RICO statute, and

22  more than two such acts occurred within two years of one another.  On information and

23  belief, Gladstone, Tringali and Ms. Gladstone engaged in numerous predicate acts between at

24  least January 1, 2007, and September 2009 in conducting and/or participating in the conduct

25  of the Gladstone/Tringali enterprise's racketeering activity.

26       84.    The pattern of racketeering activities and the related predicate acts were

27  continuous over a substantial period of time, and became a regular way in which Gladstone,

28  Tringali and Ms. Gladstone conducted the business of the Gladstone/Tringali enterprise.

1    85.    The common purpose of the Gladstone/Tringali enterprise with respect to its

2  pattern of racketeering activity was to defraud Cleanpak International (now CLPK) through a

3  kickback scheme, and the result of that activity was that Cleanpak International was

4  defrauded.

5    86.    Gladstone's violations of 18 U.S.C. §1962(c) in connection with the

6  Gladstone/Tringali enterprise proximately caused injury to Cleanpak International's business

7  or property.

8    87.    Gladstone, Moser, Langer and L4 Strategies constituted and were engaged in an

9  enterprise (the "Gladstone/Reliant enterprise") within the meaning of the federal RICO

10  statute, 18 U.S.C. §1961 et seq., including specifically 18 U.S.C. §1962(c).  Gladstone, Moser,

11  Langer and L4 Strategies each is a "person" who was associated with the Gladstone/Reliant

12  enterprise, and they were associated-in-fact.

13    88.    The Gladstone/Reliant enterprise engaged in and had an effect on interstate

14  commerce.  The Gladstone/Reliant enterprise, for example, resulted in business being

15  conducted between Huntair (based in Oregon) and various projects located in California and

16  other states; it also resulted in monies being sent in interstate commerce.

17    89.    Gladstone, Moser, Langer and L4 Strategies each knowingly and willfully

18  conducted and/or participated, directly or indirectly, in the conduct of the Gladstone/Reliant

19  enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C.

20  §1962(c).

21    90.    Between February 1, 2010, and at least late June of 2010, Gladstone, Moser,

22  Langer and L4 Strategies knowingly and willfully committed, or knowingly and willfully aided

23  in the commission of, two or more predicate offenses that constitute the pattern of

24  racketeering activity, and each on information and belief knowingly and willfully received

25  income derived, directly or indirectly, from such pattern of racketeering activity.  Such

26  predicate acts include, but are not limited to, violations of the mail fraud and wire fraud

27  statutes within the meaning of 18 U.S.C. §§1961(1) and 1962(c), through the use of the mail

28  and of the telephone as described in this Complaint.

COMPLAINT FOR DAMAGES

91.     The predicate acts all occurred after the effective date of the RICO statute, and more than two such acts occurred within two years of one another.  On information and belief, Gladstone, Moser, Langer and L4 Strategies engaged in numerous predicate acts between February 1, 2010 and late June of 2010, in conducting and/or participating in the conduct of the Gladstone/Reliant enterprise's racketeering activity.

92.     The pattern of racketeering activities and the related predicate acts were continuous over a substantial period of time, and became a regular way in which Gladstone, Moser, Langer and L4 Strategies conducted the business of the Gladstone/Reliant enterprise.

93.     The common purpose of the Gladstone/Reliant enterprise with respect to its pattern of racketeering activity was to defraud Huntair through a fraudulent and improper scheme to divert business from Huntair, and the result of that activity was that Huntair was defrauded.

94.     Gladstone, Moser, Langer and L4 Strategies' violations of 18 U.S.C. §1962(c) in connection with the Gladstone/Reliant enterprise proximately caused injury to Huntair's business or property.

95.     As a direct and proximate result of, and by reason of, the activities of Gladstone, Ms. Gladstone, Moser, Langer and L4 Strategies and their conduct in violation of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business or property, within the meaning of 18 U.S.C. § 1964(c).

            (a)     CLPK suffered damages as a result of the Gladstone/Tringali enterprise, including with respect to monies lost as a result of inflated invoices; wages, commissions and other compensation paid to Gladstone during the Gladstone/Tringali enterprise; and the costs of investigation of Gladstone, Tringali and Ms. Gladstone's acts.   CLPK is entitled to recover threefold the damages it sustained, together with the cost of this suit, including costs, attorneys' fees, and experts' fees.

            (b)     Huntair suffered damages as a result of the Gladstone/Reliant enterprise, including with respect to lost profits in connection with business diverted to Reliant; wages, commissions and other compensation paid to Gladstone and Moser during the

1  Gladstone/Reliant enterprise; loss of goodwill; interruption of Huntair's business; and the
2  costs of investigation of Gladstone, Moser, Langer and L4 Strategies' acts.   Huntair is entitled
3  to recover threefold the damages it has sustained, together with the cost of this suit, including
4  costs, attorneys' fees, and experts' fees.

**FIFTH CAUSE OF ACTION**

**(Racketeering Conspiracy- 18 U.S.C. § 1962(d) (RICO))**

**(Against Moser, Gladstone, Ms. Gladstone, L4 Strategies and Langer)**

8      96.    Plaintiffs incorporate by reference paragraphs 1 through 95 above as though
9  fully set forth herein.

10     97.    Gladstone, Tringali, and Ms. Gladstone conspired with one another (collectively
11 the "Tringali Co-Conspirators") to conduct or participate, directly or indirectly, in the conduct
12 of the affairs of the Gladstone/Tringali enterprise through a pattern of racketeering activity in
13 violation of 18 U.S.C. § 1962(d).  In particular, the Tringali Co-Conspirators each intended to
14 further an endeavor of Gladstone and Tringali which, if completed, would satisfy all of the
15 elements of a substantive RICO criminal offense and adopted the goal of furthering or
16 facilitating the criminal endeavor.

17     98.    The Tringali Co-Conspirators each were aware of the essential nature and scope
18 of the fraudulent enterprise and intended to participate in it.  The Tringali Co-Conspirators
19 each adopted the goal of furthering and/or facilitating the fraudulent Gladstone/Tringali
20 enterprise.  Specifically, each agreed to the operation of the Tringali scheme pursuant to which
21 Tringali would pay kickbacks to Gladstone, Ms. Gladstone, G-5 Group and/or Custom
22 Tinting after receiving payment from Cleanpak International on an inflated invoice.

23     99.    Gladstone, Moser, Langer and L4 Strategies conspired with one another
24 (collectively the "Reliant Co-Conspirators") to conduct or participate, directly or indirectly, in
25 the conduct of the affairs of the Gladstone/Reliant enterprise through a pattern of
26 racketeering activity in violation of 18 U.S.C. § 1962(d).  In particular, the Reliant Co-
27 Conspirators intended to further an endeavor of Gladstone and Langer which, if completed,
28 would satisfy all of the elements of a substantive RICO criminal offense and adopted the goal

SL01DOCS3452236.8                              31

1    of furthering or facilitating the criminal endeavor.

2        100.    The Reliant Co-Conspirators each were aware of the essential nature and scope

3    of the fraudulent enterprise and intended to participate in it.  The Reliant Co-Conspirators

4    each adopted the goal of furthering and/or facilitating the fraudulent Gladstone/Reliant

5    enterprise.  Specifically, each agreed to the formation and operation of the Reliant scheme

6    pursuant to which business would be fraudulently and improperly diverted from Huntair, by

7    Gladstone and Moser, while they were still employed by Huntair.  Each expressly agreed to

8    participate in the predicate offenses.

9        101.    Plaintiffs were injured by the Reliant Co-Conspirators and Tringali Co-

10   Conspirators' overt acts that are acts of racketeering or otherwise unlawful under the RICO

11   statute, which included (among other acts) acts of mail and wire fraud.

12       102.    As a direct and proximate result of, and by reason of, the activities of the

13   Defendants and their conduct in violation of 18 U.S.C. § 1962(d), Plaintiffs have been injured

14   in their business or property, within the meaning of 18 U.S.C. § 1964(c).

15           (a)    CLPK suffered damages as a result of the Tringali Co-Conspirators'

16   involvement in the Gladstone/Tringali enterprise, including with respect to monies lost as a

17   result of inflated invoices; wages, commissions and other compensation paid to Gladstone

18   during the Gladstone/Tringali enterprise; and the costs of investigation of the Tringali Co-

19   Conspirators' acts.   CLPK is entitled to recover threefold the damages it sustained, together

20   with the cost of this suit, including costs, attorneys' fees, and experts' fees.

21           (b)    Huntair suffered damages as a result of the Reliant Co-Conspirators'

22   involvement in the Gladstone/Reliant enterprise, including with respect to lost profits in

23   connection with business diverted to Reliant; wages, commissions and other compensation

24   paid to Gladstone and Moser during the Gladstone/Reliant enterprise; loss of goodwill;

25   interruption of Huntair's business; and the costs of investigation of Gladstone, Moser, Langer

26   and L4 Strategies acts.   Huntair is entitled to recover threefold the damages it sustained,

27   together with the cost of this suit, including costs, attorneys' fees, and experts' fees.

28

## SIXTH CAUSE OF ACTION

### (Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a))

### (Against Defendants Gladstone, Moser, Langer and L4 Strategies)

103.    Plaintiffs incorporate by reference paragraphs 1 through 72 above as though fully set forth herein.

104.    Moser and Gladstone, in connection with providing and/or offering to provide cleanroom-related goods and services, and in conjunction with Langer and L4 Strategies, used in commerce words, false or misleading descriptions of facts, and/or false or misleading representations of fact, which were likely to and did create confusion and/or mistakes among Huntair's customers and/or potential customers. Such confusion and/or mistakes included whether (i) Reliant was affiliated with, part of, and/or working with Huntair, and/or (ii) Huntair was aware of and/or approved of what Reliant was doing. For example:

(a)    Moser, while purporting to act on behalf of Huntair, sent Reliant quotes to customers and potential customers; on information and belief, such actions misled one or more customers and potential customers to believe that Reliant was affiliated with Huntair/Servicor and that Huntair/Servicor approved or was aware of Moser and Reliant's activities;

(b)    Moser told Doe & Ingalls that "we" – i.e., Huntair/Servicor – provide cleanroom equipment through Reliant. Based on Moser's statements and actions, Doe & Ingalls was under the misimpression that Reliant was part of, or affiliated with, Huntair/Servicor;

(c)    On information and belief, Moser led Allaway to believe, incorrectly, that Reliant was affiliated with Huntair/Servicor, and that Reliant handled installation aspects of Huntair's Servicor-related projects for Huntair/Servicor;

(d)    Moser sent an April 14, 2010, e-mail to NC State University regarding "Servicor hardwall cleanroom and assembly proposals." Moser sent two proposals with his e-mail, one for Servicor and one for Reliant. Moser sent the e-mail and the proposals as the Regional Sales Manager, Servicor Clean Rooms. NC State University incorrectly believed that

1  Reliant was part of, or was working or affiliated with, Huntair/Servicor;

2          (e)    Gladstone provided a quote from Reliant to Modified Polymers, copying
3  Langer of L4 Strategies on the e-mail, with Gladstone's e-mail reflecting his Huntair position
4  of "National Sales Manager, Servicor Clean Rooms."  Gladstone, however, was not acting on
5  behalf of Huntair when he sent the Reliant quote;

6          (f)    On information and belief, Huntair's customer Heraeus was under the
7  mistaken belief – caused by Moser – that Huntair was responsible for the installation work on
8  a project when on information and belief Reliant was responsible;

9          (g)    On information and belief, Gladstone caused Huntair customer
10  LensVector to be confused and/or mistaken as to whether G-5 Group was part of, or
11  affiliated with, Huntair;

12          (h)    Gladstone arranged for certain work for Flexline, making the
13  arrangements using his Servicor e-mail address and his Servicor "National Sales Manager"
14  title.  However, Gladstone told Flexline to make the purchase order to G-5 Group;

15          (i)    Gladstone offered to sell a cleanroom and some filters to Touchdown
16  Tech.  Gladstone told Touchdown Tech to coordinate all correspondence with Gladstone of
17  "Servicor Clean Rooms," but to make the check payable to G-5 Group; and

18          (j)    After Moser was terminated by Huntair, Moser indicated to Huntair's
19  client Ameridose that he, Gladstone, and Reliant were still affiliated with Servicor when in fact
20  they were not and are not.

21      105.   The conduct of Gladstone, Moser, Langer and L4 Strategies herein violates 15
22  U.S.C. § 1125(a)(1)(A).  Such Defendants provided, in concert and participation with one
23  another, false and misleading descriptions and/or representations of facts which caused
24  confusion and mistakes, and which deceived as to the affiliation, connection, or association of
25  Reliant with Huntair/Servicor, and/or as to Huntair/Servicor's approval of Reliant's goods,
26  services, and/or commercial activities.

27      106.   As a result of Gladstone, Moser, Langer and L4 Strategies' violations of 15
28  U.S.C. § 1125(a)(1)(A), Huntair has suffered and will continue to suffer damage and harm in

1   an amount to be established at trial.  As a result, Huntair is entitled to treble damages, lost

2   profits, disgorgement of Gladstone, Moser, Langer and L4 Strategies' profits, and an award of

3   attorneys' fees and costs.  Huntair is also entitled to injunctive relief enjoining further

4   violations of 15 U.S.C. § 1125(a)(1)(A).

5                           **SEVENTH CAUSE OF ACTION**

6                **(Unlawful and Unfair Business Practices Under Business and**

7                     **Professions Code § 17200 et seq. and Conspiracy)**

8         **(Against Moser, Gladstone, Ms. Gladstone, L4 Strategies and Langer)**

9         107.   Plaintiffs incorporate by reference paragraphs 1 through 106 above as though

10  fully set forth herein.

11        108.   Defendants' actions described herein constitute unlawful, unfair and fraudulent

12  business practices under Business and Professions Code, sections 17200 et seq. (the "Unfair

13  Competition Law," or "UCL").  In particular, and without limitation, (a) Gladstone and

14  Moser's efforts and activities in connection with their improperly diverting business from

15  Huntair for and on behalf of Reliant while they were employed by Huntair, (b) Moser and

16  Reliant's use of Huntair's confidential information regarding leads, quotes, pricing and profit

17  margins to solicit and pursue Huntair's customers and prospective customers for and on

18  behalf of Reliant, and (c) Gladstone and Moser's  conduct in confusing and misleading

19  customers and potential customers regarding, for example, whether Reliant is part of, or

20  affiliated or working with Huntair/Servicor, constitute unlawful, unfair and/or fraudulent

21  business practices.  Gladstone and Moser's activities were undertaken in concert and

22  participation with Langer and L4 Strategies, as part of the Reliant scheme.

23        109.   Gladstone, Moser, Langer and L4 Strategies' actions in connection with the

24  Reliant scheme constitute unlawful business practices or acts under the UCL in that they

25  violate California and federal law, including, but not limited, with respect to breach of the duty

26  of loyalty, fraud and deceit, intentional interference with prospective economic advantage, 18

27  U.S.C. §§ 1962(c) and (d), and Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

28        110.   Gladstone, Moser, Langer and L4 Strategies' activities in connection with the

1  Reliant scheme were and are, <u>inter alia</u>, immoral, unethical, unlawful, unscrupulous and
2  fraudulent.

3      111.   Gladstone, Tringali and Ms. Gladstone's actions in connection with the Tringali
4  scheme constitute unlawful business practices or acts under the UCL in that they violated
5  California and federal law including, but not limited, with respect to breach of the duty of
6  loyalty, fraud and deceit, and RICO 18 U.S.C. §§ 1962(c) and (d).

7      112.   Gladstone, Tringali and Ms. Gladstone's activities in connection with the
8  Tringali scheme (including receiving kickbacks) were and are immoral, unethical, unlawful,
9  unscrupulous and fraudulent.

10     113.   Gladstone's conduct in diverting cleanroom-related business to himself and/or
11  G-5 Group, while Gladstone was employed by Huntair and/or Cleanpak International, was an
12  unfair business practice, and was and is, <u>inter alia</u>, immoral, unethical, unscrupulous and
13  fraudulent.

14     114.   As a result of such Defendants' acts as alleged herein, Plaintiffs have lost money
15  and suffered an injury in fact, including with respect to (a) monies paid as a result of the
16  inflated Tringali invoices in connection with the Tringali scheme, (b) lost profits due to
17  Moser, Gladstone, Langer and L4 Strategies' actions diverting business through the Reliant
18  scheme, and (c) monies paid to Moser and Gladstone at a time when they were engaged in the
19  misconduct described herein.

20     115.   Plaintiffs are entitled to restitution of any and all money or property that
21  Defendants acquired by means of such unfair, unlawful and/or fraudulent business practices,
22  and to injunctive relief enjoining Gladstone, Moser, Langer and L4 Strategies from further
23  violations of the UCL.

24  **EIGHTH CAUSE OF ACTION**

25  (**Conversion Against Defendants Gladstone and Moser**)

26     116.   Plaintiffs incorporate by reference paragraphs 1 through 50 above as though
27  fully set forth herein.

28     117.   At all times herein mentioned, Plaintiffs had, and still have, an interest in any

1  monies they paid (a) to Tringali/Tringali Construction and/or anyone else pursuant to

2  improperly inflated invoices or costs presented directly or indirectly by Gladstone and/or

3  Moser to Plaintiffs for payment, and (b) for any costs or expenses for which Gladstone

4  and/or Moser were reimbursed by Plaintiffs but which were incurred by Gladstone and/or

5  Moser in furtherance of their misconduct.

6        118.    Plaintiffs were, and still are, entitled to the possession of the monies they paid

7  because of costs, quotes or invoices being inflated for improper reasons such as kickbacks.  In

8  relation to the Tringali scheme, CLPK on information and belief is owed at least $163,000.

9  The investigation is ongoing, and the total monies owed hereunder will be established

10  according to proof, including based upon checks from Tringali made payable to Gladstone,

11  Ms. Gladstone, G-5 Group and/or Custom Tinting.  In addition, Huntair is entitled to the

12  possession of any monies it paid to Gladstone or Moser to reimburse them for expenses they

13  incurred in furtherance of their misconduct.

14        119.    Gladstone and Moser's acts directly and proximately caused harm and damage

15  to Plaintiffs.

16        120.    Gladstone acted with oppression, fraud and malice with respect to the Tringali

17  scheme.  CLPK is thus entitled to an award of punitive damages against him with respect to

18  this conversion claim.

19                       **PRAYER FOR RELIEF**

20        WHEREFORE, Plaintiffs pray for judgment in their favor and against Defendants,

21  and that Plaintiffs be awarded:

22            (A)    compensatory damages in amounts to be established according to proof;

23            (B)    punitive and exemplary damages;

24            (C)    restitution and all other relief provided for under Business and

25  Professions Code sections 17200 et seq.;

26            (D)    disgorgement of profits and other unjust enrichment gained by

27  Defendants through their improper and/or unlawful conduct against Plaintiffs, including

28  wages, commissions and other compensation paid to Gladstone and Moser;

1        (E)    damages for the wages, commissions and other compensation paid to

2  Moser and Gladstone during the course of the events alleged herein in amounts to be

3  established according to proof;

4        (F)    attorneys' fees and costs;

5        (G)    interest, including pre-judgment interest, in accordance with applicable

6  law; and

7        (H)    such other and further relief as is just and proper.

8                  Respectfully submitted,

9  Dated: August 1, 2010         **BRYAN CAVE LLP**

11              By:

12                James Goldberg, Cal. Bar No. 107990
                  Tracy M. Talbot, Cal. Bar No. 259786
13                Two Embarcadero Center, Suite 1410
                  San Francisco, California 94111
14                Telephone:  415-675-3400
                  Facsimile:  415-675-3434
15                Email: james.goldberg@bryancave.com
                      tracy.talbot@bryancave.com
16                Attorneys for Plaintiffs
                  HUNTAIR, INC. and CLPK, LLC

1    ## DEMAND FOR JURY TRIAL

2    Pursuant to Rule 38 of the Federal Rules of Civil Procedure and Civil Local Rule 3-6,

3    Plaintiffs hereby demand a jury trial on all issues triable by jury.

4

5                                                       Respectfully submitted,

6    Dated: August 6, 2010                            **BRYAN CAVE LLP**

7

8                                              By: _____
                                                   James Goldberg, Cal. Bar No. 107990
9                                                  Tracy M. Talbot, Cal. Bar No. 259786
                                                   Two Embarcadero Center, Suite 1410
10                                                 San Francisco, California 94111
                                                   Telephone:    415-675-3400
11                                                 Facsimile:    415-675-3434
                                                   Email: james.goldberg@bryancave.com
12                                                         tracy.talbot@bryancave.com
                                                   Attorneys for Plaintiffs
13                                                 HUNTAIR, INC. and CLPK, LLC

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28